FILED
IN OPEN COURT

DEC 2 2 2017

CLERK, U.S. ...

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | No. 1:17-CR-254 |
| ) | |
| RODRIGUEZ RODNEY LOMAX NORMAN, ) | |
| a/k/a "RODDOE," ) | |
| ) | |
| Defendant. ) | |

## STATEMENT OF FACTS

The United States and the defendant, RODRIGUEZ RODNEY LOMAX NORMAN, agree that the following facts are true and correct, and that had this matter proceeded to trial the United States would have proven them beyond a reasonable doubt with admissible and credible evidence:

### I. Overview of bank/wire fraud conspiracy

1. Between at least in or around January 2015 to in or around August 2017, defendant knowingly and intentionally agreed and conspired with at least co-conspirators N.W., M.M., JAMAR JOHNSON, G.T., E.C., RYAN MCNEIL, in the Eastern District of Virginia and elsewhere, to execute a fraud scheme whereby:

    a. defendant and his co-conspirators bought stolen credit and debit card numbers online using Bitcoin currency;

    b. defendant and his co-conspirators electronically encoded these stolen credit/debit numbers onto the magnetic stripes of physical cards, a process they referred to as "writing up" cards; and

    c. defendant and his co-conspirators then used these fraudulent cards to make credit/debit card purchases at businesses in the Eastern District of Virginia and elsewhere. Defendant and his co-conspirators knew that the ultimate payors for their fraudulent purchases

were not them but the financial institutions that issued the card numbers that were used, the true account holders, or others.

2. Throughout the conspiracy, defendant resided in the 2000 block of St Clair Place, Temple Hills, MD. Defendant also maintained a property in the District of Columbia at 3411 Brothers Place SE, Washington, DC. Defendant's co-conspirators sometimes referred to him by the nickname "RODDOE" or "RODNEY." Defendant used a cellphone with the phone number (202) 600-XXXX over which he had dominion and control.

3. As part of the conspiracy, from at least early 2015 to August 2017, defendant and co-conspirator TRAVON WILLIAMS shared a user account on a website that sold stolen credit card data. Defendant and WILLIAMS kept control over the login, password, and Bitcoin money on this user account, which they named "Buddy718," and they used this account to buy stolen credit/debit card numbers for both themselves as well as co-conspirators N.W., M.M., G.T. and JAMAR JOHNSON, among others. Sometime in 2016 or 2017, a co-conspirator created another user account so that other co-conspirators, including G.T., could use it to buy stolen credit card data. By 2016, co-conspirators N.W., M.M., and JOHNSON, among others, had also created their own user accounts on various sites that sold stolen credit card numbers.

4. Defendant and his co-conspirators paid a range of Bitcoin prices for stolen credit card numbers, depending in part on which bank issued the card number and the true cardholder's geographic location. The online black market shops that the conspirators used identified which banks had issued a particular stolen card number through BINs, or Bank Identification Number, which were unique to a particular bank.

5. As part of the conspiracy, defendant and his co-conspirators determined which stolen card numbers to buy based in part on a card number's BIN and the geographic location of

2

the true cardholder. Defendant and his co-conspirators knew that the stolen credit/debit card numbers they bought belonged to real persons. As defendant told some of his co-conspirators, he preferred to buy stolen card numbers assigned to accountholders in the Virginia/DC/Maryland area because those numbers were less likely to be declined when used by the conspirators in the Virginia/DC/Maryland area.

6. Some of the banking institutions that defendant and his co-conspirators targeted – that is, the conspirators bought stolen credit/debit account numbers issued by these entities – included the following entities, not all of which defendant had personal knowledge of: Anthem Bank & Trust, Bancorp Bank, Bank of America, Barclays Bank of Delaware, Capital One Bank, Citibank, Citizens Bank, First Financial Bank, First Hawaiian Bank, Iberia Bank, JP Morgan Chase Bank, Meta Bank, PNC Bank, Regions Bank, TD Bank, Town North Bank, U.S. Bank, USAA Federal Savings Bank, Wells Fargo Bank, Whitney Bank, and Woodforest National Bank; as well as credit unions such as Bayou Federal Credit Union, Campus Federal Credit Union, Capital City Press Federal Credit Union, Congressional Credit Union, Department of Corrections Credit Union, Eagle Federal Credit Union, First Commonwealth Federal Credit Union, Franklin Mint Federal Credit Union, LA Capitol Federal Credit Union, LES Federal Credit Union, Louisiana USA Federal Credit Union, Navy Federal Credit Union, Pelican State Credit Union, Pentagon Federal Credit Union, Santa Cruz Community Credit Union, South Florida Educational Federal Credit Union, and Utilities Employees Credit Union, among others.

7. In furtherance of the conspiracy, defendant owned and used a credit card reader-writer.

8. As part of the conspiracy, defendant used the fraudulent credit cards to make material and food purchases from local merchants. Defendant and his co-conspirators also used

the fraudulent credit/debit cards they produced to buy gift cards, which they then used to deposit money into bank accounts that they controlled. Additionally, Defendant also used fraudulent credit cards to load money onto merchant gift cards and subsequently used those gift cards at the merchant's place of business or resold those gift cards to other people for a portion of their face value.

9.  From the beginning of the conspiracy through August 2017, defendant provided instruction and advice to co-conspirators on the process of purchasing stolen credit/debit card numbers, encoding those numbers onto fraudulent credit cards, and utilizing those cards to purchase cartons of cigarettes. Until co-conspirators branched out and made their own on-line accounts, defendant controlled the on-line account and purchased the fraudulent credit card numbers for the co-conspirators involved in the conspiracy.

## II. Overview of contraband cigarette distribution conspiracy

10. From in or around December 2015 to August 2017, defendant and his co-conspirators agreed to and did use the conspiracy-created cards to buy cartons of cigarettes at businesses in the Eastern District of Virginia and elsewhere, at an approximate price of $55 to $65 per carton, for the purpose of reselling the cartons for cash. Each cigarette carton typically contained 10 packs of cigarettes for a total of 200 cigarettes.

11. As part of this scheme, defendant and his co-conspirators resold their fraudulently obtained bulk cigarettes to buyers from New York, knowing that the cigarettes were intended for resale on the New York black market. One buyer, A.H., paid defendant and his conspirators approximately $47 in cash per cigarette carton. Defendant, co-conspirator WILLIAMS, and others regularly arranged for A.H., who drove down from New York, to meet them in the parking garage of co-conspirator G.T.'s Arlington apartment building, outside of defendant's

residence at 2442 St. Clair Dr, Temple Hills, MD and other places, in order to exchange the conspiracy-purchased cigarette cartons for cash. For each such meeting with A.H., defendant and his co-conspirators distributed and sold to A.H. between approximately 200 to 400 cartons of cigarettes.

12. As further part of the conspiracy, defendant organized, supervised, and/or managed co-conspirator RYAN MCNEIL, to use the conspiracy-created cards to buy cartons of cigarettes in furtherance of the scheme. Defendant paid MCNEIL in cash for each cigarette carton he bought with the conspiracy's cards and turned over to him for resale.

13. Defendant and his co-conspirators sometimes used fraudulent identification documents, including fake driver's licenses, in conjunction with their use of fraudulent credit cards to buy cigarette cartons.

14. Defendant attended meetings with A.H., a bulk cigarette buyer from New York who during the conspiracy regularly drove down from New York to northern Virginia to meet defendant or defendant's co-conspirators. During these meet ups, defendant and his co-conspirators, including G.T., M.M., WILLIAMS, JAMAR JOHNSON, and ASHLEY HOWELL, provided A.H. with hundreds of cigarette cartons at a time in exchange for payment of $47 per carton.

### III. Specific acts

15. In or about March 2015, defendant and co-conspirator WILLIAMS exchanged text messages about buying credit/debit card numbers from an Internet site that sold stolen credit card data. On or about March 28 and 29, 2015, defendant and WILLIAMS exchanged text messages about having credit cards created for defendant in the fake name "Jefferey Scott."

16. In or about September 2016, defendant, using phone number 202-271-6563, and

co-conspirator MCNEIL exchanged text messages stating:

> MCNEIL: Most of them r duds. U do the math, 15 cartins out of 20 cards, 4 left
>
> Defendant: Wow that's fucking terrible. Wow wow wow. Ok knock those out ..I'm heading out when you get here..fuck that something wrong. I gotta see what's up with these joints. They should be ringing.

17. In or about November 2016, defendant, using phone number 202-271-6563, and co-conspirator MCNEIL exchanged text messages stating:

> MCNEIL: Damn, I just got the last of what they had which was Marlboro light box. 6285.
>
> Defendant: That's good. I'm saying no Marlboro red. Marlboro gold light up a good.
>
> MCNEIL: Yeah but they're not 100s. 8538.
>
> ...
>
> Defendant: Did you leave your joints with me to write up?
>
> ...
>
> MCNEIL: 25 so far, its gonna be a huge day.
>
> Defendant: Dope dope dope
>
> ...
>
> MCNEIL: 45 and still have 30 cards left
>
> Defendant: Wow lmao
>
> MCNEIL: Trunk is fuckin HEAVY!!! Be ready to cash me out my nigg!

18. In or about January 2017, defendant, using phone number 202-271-6563, and co-conspirator MCNEIL exchanged text messages stating:

6

       Defendant: You've cashed out $18,497 total. Hope you got something to show for it.

       MCNEIL: Damn I wish I had all of that.

       Defendant: Make sure that you stacking. You never want to look back when this run is over (and it's a fact that it will come to an end...) and say to yourself that those were the days and not have a dime to your name.

19.    On or about July 14, 2015, the defendant attempted to purchase two cartons of Newport cigarettes at the Giant grocery store at 3480 South Jefferson St, Falls Church, VA using a fraudulent credit card. During the transaction, the Giant clerk noticed that the last four digits on the front of the card did not match the last four digits of the account number that came up on the point of sale scanner. The clerk notified the defendant that he suspected fraud and confiscated the defendant's license and fraudulent credit card. The credit card number defendant attempted to use was issued by Citibank to L.S. who is not the defendant.

20.    Defendant does not deny that in a one-month period between July 2, 2017 and August 6, 2017, over the course of five meetings, defendant and his co-conspirators sold A.H. approximately 1,683 cartons of cigarettes for $47 per carton, or for a total of approximately $79,101 in cash, including during the following incidents:

       a.    On or about July 2, 2017, A.H. drove from New York to meet defendant and co-conspirator WILLIAMS in the Eastern District of Virginia and elsewhere, where A.H. bought from the conspirators 341 cigarette cartons for transportation back to and distribution in New York. Because defendant was unavailable to meet with A.H. that night, R.N.'s girlfriend J.J. stockpiled defendant's cartons of cigarettes and arranged to meet A.H. in order to complete the transfer to A.H.

7

b. On or about July 30, 2017, A.H. drove from New York to meet WILLIAMS and his co-conspirators in the Eastern District of Virginia, where A.H. bought from the conspirators 395 cigarette cartons for transportation back to and distribution in New York. These 395 cartons were purchased and/or stockpiled by defendant and co-conspirators WILLIAMS, M.M., and E.C., among others.

c. On or about August 6, 2017, A.H. drove from New York to meet defendant and co-conspirators WILLIAMS and M.M. in the Eastern District of Virginia, where A.H. bought from the conspirators approximately 366 cigarette cartons for transportation back to and distribution in New York. These 366 cartons were purchased and/or stockpiled by defendant, WILLIAMS, M.M. and E.C., among others. WILLIAMS initially invited co-conspirator JOHNSON to contribute his stockpile of cigarette cartons, but WILLIAMS later determined that adding JOHNSON's cartons would exceed the number of cartons A.H. could fit in his car for transportation back to New York. Of the 366 cartons the conspirators sold to A.H. that day, WILLIAMS fraudulently purchased 30 of them from one store with stolen credit card numbers that M.M. and E.C. read to him over the phone, and defendant offered to pay the store clerk $150 to let him buy the 30 cartons.

21. By at least July 2017 until August 24, 2017, while co-conspirator MCNEIL was facing credit card fraud charges in Fairfax County Circuit Court, defendant provided MCNEIL with dozens of fraudulent credit cards, which MCNEIL then used or attempted to use at various businesses in the Eastern District of Virginia to buy cigarettes. In some instances defendant coached MCNEIL on how to develop a reliable source of supply for cigarettes:

a. On July 30, 2017, MCNEIL, using telephone number 202-674-XXXX called defendant and informed him that he had used all sixteen credit cards from the previous day.

8

Defendant went on to instruct MCNEIL to co-locate his new cigarette purchases with the 52 cartons of cigarettes defendant already had on hand.

  b. On August 1, 2017, MCNEIL drove to the Sunoco in Chantilly, VA where he purchased four cartons of cigarettes with the fraudulent cards. The Sunoco recognized MCNEIL as the same individual they had alerted FCPD about as far back as March 2017. The Sunoco had recently changed its cigarette sales policy to allow a single person up to three cartons of cigarettes if using credit/debit to purchase the cigarettes. Any purchases over three cartons would require a cash transaction. Sunoco put this policy in place after suffering multiple chargebacks for fraudulent credit/debit transactions. MCNEIL attempted to purchase four cartons of cigarettes but only left with three due to the aforementioned policy.

  c. On or about August 2, 2017, MCNEIL drove to defendant's residence in Temple Hills, MD and obtained fraudulent credit cards. MCNEIL then proceeded to the Sunoco in Chantilly, VA where he purchased three cartons of cigarettes with the fraudulent cards. MCNEIL attempted to re-enter the Sunoco and use more fraudulent credit cards to purchase additional cigarettes but he was denied service having reached the Sunoco's daily limit of cigarette purchase by a single individual.

  d. On or about August 3, 2017, defendant called MCNEIL, who was using telephone number 202-674-XXXX. MCNEIL advised defendant he was at the BP on Sudley Ave and was having trouble buying as many carton of cigarettes as MCNEIL wanted at one time. Defendant instructed MCNEIL that if he would make purchases of food for the clerks at the gas stations MCNEIL would likely develop a relationship with them where they would then sell large quantities of cigarettes to MCNEIL regardless of their store's policies.

23. In an August 22, 2017 phone call, defendant stated to WILLIAMS that he had used a "$3 dollar joint" – meaning a stolen credit card number – to fraudulently buy $4,500 worth of items, and that the card number "went through at Macy's for 850 at one time son." Defendant further stated that the card number was issued by "U.S. Associate" or some "super regular" bank. In the same conversation, defendant stated that he had about 215 cigarette cartons and WILLIAMS stated that he had 80 cigarette cartons. WILLIAMS stated that they would be "ready to cash out" later that week.

24. On August 24, 2017, law enforcement lawfully seized from defendant's residence in Temple Hills, MD, in the Greenbelt District of Maryland, the following items that were in defendant's possession: a credit card encoding device, 165 credit cards with various names such as JEFFREY SCOTT, GUY ULMER SANTOS, GUY ULMER, GUY SANTOS, RODRIGUEZ NORMAN and VERSA TRAFFIC MANAGEMENT, 129 gift cards from various retailers and 223 cartons of cigarettes.

IV. **Dog Fighting Ventures**

25. From an unknown date lasting until August 24, 2017, Rodriguez Rodney Lomax Norman and associates including individuals referred to herein as "AB" and "TJ", sponsored and exhibited dogs in an animal fighting venture, and possessed, trained, and transported them for participation in animal fighting ventures. The dogs sponsored and exhibited in the animal fighting venture included the seized dogs.

26. Norman and others were involved in fighting dogs, which they frequently arranged via an administrative board known as the "DMV board," which is used to arrange and coordinate dogfighting in Washington D.C., Maryland, and Virginia.

27. In or about November 2016, a dog by the name of "Pablo" sponsored by

Defendant won a fight that lasted one hour and 12 minutes. After the fight, Defendant texted an associate that "Tough Love's Pablo" won the fight. Defendant is associated with Tough Love Kennels.

28. Defendant often talked with his associates about a pitbull terrier dog known as "Vegas. At the website apbt.online-pedigrees.com, photos are posted of a pitbull terrier-type dog, identified as "Tough Love's Vegas," who is claimed to be owned and bred by "Tough Love", with a "chainweight" of 41 and a conditioned weight of 36. The webpage includes the comment that "Vegas proves to be a tough competitor."

29. Defendant regularly talked with AB about dog fighting and dogs including Vegas. A registration certificate for Vegas found by the FBI at the above referenced St. Clair Drive premises on August 24, 2017, identified Vegas's owner and breeder as AB, of Stafford, Virginia.

30. On July 29, 2017, Defendant planned to enter Pablo in one of a series of fights organized by the "DMV Board" in or around Nanjemoy, Maryland. Defendant ultimately did not enter Pablo into the fight because Pablo was injured. Rather than forfeit the money that he paid for entering a dog into the fight, Defendant entered another dog known as "Pyrex." Pyrex was sponsored to fight against a dog from New Jersey. The dog from New Jersey entered the dog-fighting ring with a gash on his leg and was bleeding even before the fight started. In the course of the fight, Pyrex suffered severe bites.

31. Defendant was upset about the quality of Pyrex's performance in the fight, and spoke with his associate AB, from Dumfries, Virginia. Defendant said that a healthy Pablo would have killed the dog from New Jersey. Defendant and AB agreed that, because Pyrex was not a good enough fighter, Defendant would not breed Pyrex to one of AB's dogs.

32. One of the other dogs expected to be involved in the fights on July 29, 2017

organized by the "DMV Board" in or around Nanjemoy, Maryland, was a dog to be brought from Norfolk, Virginia, by Defendant's associate TJ. TJ came to the fights in Nanjemoy from Norfolk, but failed to bring the dog.

33. On August 24, 2017, the FBI executed a search warrant at the Defendant's residence on St. Clair Drive, in Temple Hills, Maryland. In addition to seizing the Defendant's dogs, officers seized or otherwise observed in the course of the searches numerous items associated with an illegal animal fighting venture.

34. Of the six dogs seized from the defendant's residence on St. Clair Drive, in Temple Hills, Maryland, three were adults and three were puppies just a few weeks old. One of the adult dogs, known as "Bosun's Sparkle," was found inside the premises with her three puppies; the two other adults were found outside in separate pens. Bosun's Sparkle is registered with the American Dog Breeders Association, Inc. as owned by "DH," in Dumfries, Virginia, and the listed breeder for her is AB.

35. One of the dogs found outside the Defendant's residence on St. Clair Drive had a weighted collar; that is to say, the dog's collar was weighted with a sandbag. Weighted collars are used by dog fighters to enhance the stamina and muscle strength of fighting dogs.

36. In the laundry room of the defendant's residence on St. Clair Drive, in Temple Hills, Maryland, there was the treadmill with plywood type siding, and a two-by-four piece of wood along the top to hook onto the dog put on the treadmill. By the treadmill was found a weight vest for a dog. Another weighted dog vest and weighted collar was found in the house.

37. Additional items were observed and/or recovered during execution of the search warrant at the defendant's residence on St. Clair Drive, which are associated with an illegal animal fighting venture. These items include: a fighting ring bearing traces of non-primate

blood; animal training and breeding equipment, muzzles, collars, leashes, chains, digital scales, a noose looking contraption with what appeared to be rawhide or fur hanging from it, apparently used to put around a dog's neck and hang them to build muscle. Also found were syringe boxes, boxes of needles, a skin-staple pack, an IV-fluid kit, and performance enhancing pharmaceuticals commonly used to increase fighting potential in dogs trained for fighting, as well as to keep injured dogs fighting longer. It is common to find veterinary supplies where dogs involved in dog fighting are being kept. Dog fighters commonly have such items as a skin-staple pack to mend the injuries of their dogs rather than seek veterinary attention, which may raise suspicion regarding the cause of the injuries. Also found were documents pertaining to dog registrations, applications, and pedigrees.

38. Also found in the laundry room of Defendant's residence on St. Clair Drive with the fighting, training, and medical equipment were three dog trophies. Two were blank and in clear plastic boxes as if they had not yet been given out. A third trophy was a black statue of a dog with a medal or ribbon around its neck, and the letters "GIS" on the dog's head. In the context of dog-fighting, "GIS" stands for "Gamest in Show." A "GIS" trophy is awarded at a fight, which is also called "a show", for the dog that exhibits the most spirit to fight and to continue to fight even when seriously or even mortally wounded. A dog can lose a fight and still be given the honor of Gamest Dog for refusing to give up even when the other dog has clearly beat it.

39. Defendant regularly talked with his associates about dog fighting and Defendant's hopes to raise a dog fighter that would attain the title of "champion." Among the items found at the defendant's residence on St. Clair Drive, was a composition book containing an entry for a list of "2017 Goals." Among the goals listed was making a "champion." In his quest to obtain

a "champion" fighting dog, Defendant bred one of the seized dogs, named "Bruiser," to other fighting dogs, including the sister of a dog-fighting champion named Champion Diablo.

40. On August 24, 2017, the FBI executed a search warrant at Defendant's property at 3411 Brothers Place, S.E., in Washington, D.C. In addition to seizing seven of the Defendant's fighting dogs, officers seized or otherwise observed in the course of the searches numerous items associated with an illegal animal fighting venture. These included lunge whips, dog pharmaceuticals, syringes, collars and shock collars, chains, stakes, skin-staple packs. One of the dogs found had a facial wound consistent with organized dog fighting.

\* \* \*

41. This Statement of Facts includes those facts necessary to support the plea agreement between the defendant and the United States. It does not include each and every fact known to the defendant or to the United States, and it is not intended to be a full enumeration of all of the facts surrounding the defendant's case.

42. The actions of the defendant, as recounted above, were in all respects knowing and deliberate, and were not committed by mistake, accident, or other innocent reason.

43. If the defendant breaches the plea agreement, then pursuant to the plea agreement, he waives any rights under Federal Rule of Criminal Procedure 11(f), Federal Rule of Evidence 410, the United States Constitution, and any federal statute or rule in objecting to the admissibility of the statement of facts in any such proceeding.

                        Dana J. Boente
                        United States Attorney

By: _____
          Maya D. Song
          Whitney Dougherty Russell
          Katherine E. Rumbaugh
          Assistant United States Attorneys

**Defendant's signature**: After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, RODRIGUEZ RODNEY LOMAX NORMAN, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial the United States would have proved the same beyond a reasonable doubt.

Date: 12/22/17

_____
Rodriguez Rodney Lomax Norman
Defendant

**Defense counsel signature**: I am the defendant's attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

Date: 12/22/17

_____
Kobie Flowers, Esq.
Attorney for Rodriguez Rodney Lomax Norman

15